**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CARLOS E. MOORE**                                                     **PLAINTIFF**

**V.**                                                     **CAUSE NO. 3:16-CV-151-CWR-FKB**

**GOVERNOR PHIL BRYANT,** *in his*                                     **DEFENDANT**
*Official Capacity*

## MEMORANDUM OPINION AND ORDER

Plaintiff Carlos Moore filed this lawsuit against Governor Phil Bryant challenging the constitutionality of the Mississippi state flag. The flag includes the Confederate battle emblem in the top left corner. Moore alleges that the incorporation of the Confederate battle emblem in the state flag violates the Thirteenth Amendment as well as various clauses of the Fourteenth Amendment.

Before reaching the merits of the case, the Court asked the parties to submit simultaneous briefing on standing and the political question doctrine. The parties did so and presented oral argument on April 12, 2016.[1] After considering the briefing, oral argument, and applicable law, the Court is ready to rule.

### I. Factual and Procedural Background

#### A. The Parties

Carlos Moore is an African-American attorney and Mississippi native who has lived in the state for most of his life. He resides in Grenada, Mississippi where he operates his own law firm and represents clients in state and federal courts throughout Mississippi.

---

[1] At the hearing, Moore and one of the associates from his firm presented argument on his behalf. A third lawyer was also at counsel table and advised the Court that he was going to enter his appearance, but he apparently has changed his mind.

Governor Phil Bryant, the chief executive officer of the state, is sued in his official capacity. He is statutorily mandated to "see that the laws are faithfully executed."[2]

### B. Constitutional Claims

Moore contends that Mississippi's state flag "is tantamount to hateful government speech [which has] a discriminatory intent and disparate impact" on African-Americans, in violation of the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment.[3] He alleges that this hate speech damages him personally along with all other African-American residents of Mississippi,[4] causing him to suffer physical and emotional injuries, and "incit[ing] private citizens to commit acts of racial violence."[5] Additionally, Moore contends that the Confederate battle emblem is a vestige of slavery prohibited by the Thirteenth Amendment.[6]

To support his allegation that the Confederate battle emblem incites racial violence, Moore points to the June 2015 mass killing of nine African-Americans at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina. In addition, he cites a November 2015 incident at a Wal-Mart in Tupelo, Mississippi when a man set off an explosive to protest Wal-Mart's decision to cease the sale of Confederate-themed merchandise. Finally, Moore references a 2014 hate crime at the University of Mississippi where university students draped a noose and the former Georgia state flag—which contained the Confederate battle emblem—around the neck of a statue of James Meredith, the University's first African-American student.[7]

---

[2] Miss. Code Ann. § 7-1-5(c).

[3] Docket No. 7, ¶ 11.

[4] At oral argument, his counsel argued that Moore is among "approximately 600 African-American lawyers who are confronted with state-approved discrimination by the adornment of the flag on a daily basis while attending court." Tr. of Oral Arg. at 5; *see also id.* at 9 ("the flag endorses discrimination against Mr. Moore and other African-Americans in both the private and public spheres").

[5] Docket No. 20-1, ¶ 10; Docket No. 7, ¶¶ 11-12. Moore filed this case on behalf of himself; he has not adequately pled or filed any motions that would cause the Court to treat it as a class action on behalf of all African-Americans.

[6] Docket No. 7, ¶ 11.

[7] *See* Factual Basis, *United States. v. Edenfield*, No. 3:15-cr-108-MPM-SAA (N.D. Miss.), available at https://www.justice.gov/opa/pr/second-man-pleads-guilty-tying-rope-around-neck-james-meredith-statue-ole-miss-

Moore argues that the Governor should be enjoined from enforcing state statutes that adopt the flag's design and mandate or allow it to fly on public property.[8]

Although the Governor has not been required to answer these specific allegations, he has filed a motion to dismiss contending that Moore's allegations fail to state a plausible claim for relief.

## II.  Historical Context

### A.  The Origin of the Confederate Battle Flag

Moore's claims challenge the constitutionality of the Mississippi state flag; however, his allegations hinge on the Confederate battle emblem contained in the state flag. Thus, the appropriate starting point is the historical landscape which spawned such a divisive emblem.

On January 9, 1861, Mississippi followed South Carolina's lead and became the second state to secede from the Union. Some argue that Mississippi's decision to secede was not at all connected to slavery, and instead assert that it was in response to an overreach of the federal government. Those who put forth this narrative need only read Mississippi's Declaration of Secession. It said:

> In the momentous step which our State has taken of dissolving its connection with the government of which we so long formed a part, it is but just that we should declare the prominent reasons which have induced our course.
>
> **Our position is thoroughly identified with the institution of slavery**— the greatest material interest of the world. Its labor supplies the product which constitutes by far the largest and most important portions of commerce of the earth. These products are peculiar to the climate verging on the tropical regions, and by an imperious law of nature, none but the black race can bear exposure to the tropical sun. These products have become necessities of the world, and a blow

---

campus; *see also* Information, Docket No. 10, *United States v. Edenfield*, No. 3:15-cr-108-MPM-SAA (N.D. Miss. Mar. 24, 2016). Plaintiff's complaint incorrectly states that it was a Confederate battle flag.

[8] Docket No. 7, ¶ 14. In his complaint and at oral argument, Moore failed to cite specific state statutes. Based on his allegations and arguments, the Court presumes he seeks to enjoin the enforcement of Miss. Code Ann. § 3-3-15 (display of state flag at public buildings); § 3-3-16 (design of state flag); and § 37-13-5 (display and study of flags at public schools).

at slavery is a blow at commerce and civilization. That blow has been long aimed at the institution, and was at the point of reaching its consummation. There was no choice left us but submission to the mandates of abolition, or a dissolution of the Union, whose principles had been subverted to work out our ruin.[9]

To put it plainly, Mississippi was so devoted to the subjugation of African-Americans that it sought to form a new nation predicated upon white supremacy. As Confederate Vice President Alexander H. Stephens stated in March 1861, the "corner-stone" of the Confederacy "rests upon the great truth that the negro is not equal to the white man; that slavery—subordination to the superior race—is his natural and normal condition. This, our new government, is the first in the history of the world, based upon this great physical, philosophical, and moral truth."[10] Although America's Constitution initially fell short of its promise to treat all people equally,[11] the Constitution of the Confederate States of America was a definitive step backward. It "overtly protected 'Negro slavery'"[12] by codifying the exclusion of people of African descent from civil protections in perpetuity.[13] In short, a core tenet of the Confederate Constitution "was the interminable white man's right to own black slaves."[14]

At his inauguration in February 1861, Confederate President Jefferson Davis said, "[t]he time for compromise has now passed, and the South is determined to maintain her position, and

---

[9] Mississippi Declaration of Secession, "A Declaration of the Immediate Causes which Induce and Justify the Secession of the State of Mississippi from the Federal Union" (1861), http://docsouth.unc.edu/imls/missconv/missconv.html (emphasis added).

[10] Alexander Stephens, Vice President of Confederate States of America, Cornerstone Speech in Savannah Georgia (Mar. 21, 1861), http://www.ucs.louisiana.edu/~ras2777/amgov/stephens.html.

[11] "While the Union survived the civil war, the Constitution did not. In its place arose a new, more promising basis for justice and equality, the 14th Amendment, ensuring protection of the life, liberty, and property of all persons against deprivations without due process, and guaranteeing equal protection of the laws." Justice Thurgood Marshall, Remarks at the Annual Seminar of the San Francisco Patent and Trademark Ass'n (May 6, 1987) [hereinafter *Marshall Bicentennial Speech*].

[12] Alexander Tsesis, *The Problem of Confederate Symbols: A Thirteenth Amendment Approach*, 75 Temp. L. Rev. 539, 543 (2002) (citation omitted).

[13] Confederate States of America Const. art. I, § 9(4) ("No . . . law denying or impairing the right of property in Negro slaves shall be passed").

[14] Tsesis, *supra*, at 557.

make all who oppose her smell Southern powder and feel Southern steel."[15] On April 12, 1861, the Civil War began at Fort Sumter in South Carolina. A bloody four years followed, during which more American soldiers died than in any war before or since.[16] In reflection of the war, President Lincoln noted: "All dreaded it, all sought to avert it. . . . Both parties deprecated war but one of them would make war rather than let the nation survive and the other would accept war rather than let it perish, and the war came."[17]

The banner commonly referred to as the "Confederate flag" was not the flag of the Confederacy; it was adopted primarily for use by Confederate armies during battle.[18] While the battle flag never flew as the official pennant for the Confederacy,[19] it nevertheless is the most recognized symbol of the Confederacy.

### B.  Keeping the Spirit of the Confederacy Alive

Upon the readmission of the Confederate states to the Union, the South committed itself to two "new" causes—the continuation of a racial caste system and the endurance of Antebellum culture. During Reconstruction, organizations like the Ku Klux Klan, Knights of the White Camellias, and the White League sought to preserve white supremacy by using intimidation and violence to terrorize African-Americans.[20]

---

[15] Jefferson Davis, Confederate States of America Inaugural Speech (Feb. 16, 1861).

[16] *See* Megan Crigger and Laura Santhanam, *How Many Americans Have Died in U.S. Wars?*, PBS News Hour, May 24, 2015; Guy Gugliotta, *New Estimate Raises Civil War Death Toll*, N.Y. Times, Apr. 2, 2012.

[17] President Abraham Lincoln, Second Inaugural Address (March 4, 1865), http://avalon.law.yale.edu/19th_century/lincoln2.asp.

[18] E. Merton Coulter, *The Flags of the Confederacy*, 37 Georgia Historical Quarterly, Sept. 1953, at 188, 188.

[19] The Confederacy had a number of official flags. According to one source, the flag adopted by General Robert E. Lee was incorporated into the design of the Confederacy's final official flag, first adopted in 1863. Robert J. Bein, *Stained Flags: Public Symbols and Equal Protection*, 28 Seton Hall L. Rev. 897, 898 n.3 (1998).

[20] Derrick Bell, Race, Racism, and American Law 229-30 (2008); *see also* Charles Reagan Wilson, Baptized in Blood: The Religion of the Lost Cause 1865-1920 110-12 (1980).

In 1866, there were riots in Memphis and New Orleans; more than 30 African-Americans were murdered in each melee.[21] In 1874, 29 African-Americans were "massacre[d]" in Vicksburg, according to Congressional investigators.[22] The next year, "amidst rumors of an African-American plot to storm the town," the Mayor of Clinton, Mississippi gathered a white "paramilitary unit" which "hunted" and killed an estimated 30 to 50 African-Americans.[23] Violence also broke out in Meridian, Austin, and Yazoo City, among many other towns in Mississippi.[24] The death and destruction, moreover, were not confined to the borders of the Southern states.[25] Racial violence continued through the 1870s as local Klan groups lynched, beat, burned, and raped African-Americans.[26] Despite the Klan's record of violence, "Southerners romanticized it as a chivalrous extension of the Confederacy."[27]

---

[21] Howard Zinn, A People's History of the United States 203 (2001); *see also* A. Leon Higginbotham, Shades of Freedom: Racial Politics and Presumptions of the American Legal Process, 88-89 (1996) (describing the brutal attack by Ku Klux Klan members on a group of African-American Republicans, killing at least 60 people).

[22] Nicholas Lemann, Redemption 88, 91 (2006). In Lemann's telling, the Congressional investigating committee claimed "that what the whites preferred to see as the suppression of a Negro uprising was actually cover for a program of officially encouraged, random, unpunished violence against innocent Negroes with the overall political aim of disenfranchisement." *Id.* at 98.

[23] Melissa Janczewski Jones, *The Clinton Riot of 1875: From Riot to Massacre*, Mississippi History Now, Sept. 2015.

[24] Lemann, *supra*, at 71, 75, 109, 112.

[25] *See* Bell, *supra*, at 230 (noting a riot after the turn of the century in East St. Louis, Illinois where the estimates of African-Americans killed ranged from 40-200, and nearly 6,000 were forced to leave their homes); Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* (2015) (documenting 4,075 lynchings of African-Americans in 12 Southern states between 1877 and 1950—at least 800 more lynchings in these states than previously reported); *see also* Kenneth O'Reilly, Nixon's Piano: Presidents and Racial Politics from Washington to Clinton 91-92, 122 (1995) (noting riots in East St. Louis, Chicago, Washington, D.C., Philadelphia, and Sikeston, Missouri).

[26] Zinn, *supra*, at 203. Klan membership declined with the end of Reconstruction, but rebounded in the 1920s, when it boasted over 4 million members. *Id.* at 382.

  To be clear, these organized groups were not the only perpetrators of this terror. "[L]ynchings and whippings, . . . arson and random shooting[s], were just as frequently carried out by ad hoc mobs or even individuals." Bell, *supra*, at 230; *see generally* Ralph Ginzburg, One Hundred Years of Lynching (1988) (reprinting hundreds of newspaper articles chronicling lynchings throughout the United States); O'Reilly, *supra*, at 122 (noting nearly 4,000 lynchings in the United States between 1889 and 1941); Mark V. Tushnet, Thurgood Marshall: His Speeches, Writing, Argument, Opinions and Reminiscences ix (2001) (writing that between the 1880s and the 1930s more than 4,700 persons were lynched). One of the most pernicious things about these killings is that they were public spectacles, open to the community at large, with women and children as gleeful participants. *See* Manfred Berg, Popular Justice: A History of Lynching in America 91 (2011) ("During the decades between the end of Reconstruction and the 1920s 'spectacle lynchings' before large crowds, often involving drawn out torture, mutilation, burning, and the dismemberment of the victim's body, occurred regularly in the New South); Barbara Holden-Smith, *Lynching, Federalism, and the Intersection of Race and Gender in the Progressive Era*, 8 Yale J. L.

Alongside the terror permeating the South, there was a prominent movement to ensure the "proper" historical recollection of the Civil War—that the Southern cause had been just and necessary. This campaign was taken up by Confederate veterans and social groups.[28] Women's auxiliary groups initially organized locally, but evolved into an influential national organization called the United Daughters of the Confederacy (UDC).[29] By 1912, the UDC had 45,000 members spread across over 800 chapters.[30] It raised funds for Confederate monuments, promoted the celebration of Confederate holidays, maintained Confederate museums, and established "Children of the Confederacy" educational programs.[31] Children in these programs learned history in the form of catechisms (a series of fixed questions and answers used for instruction), a method typically reserved for teaching religious doctrine.[32] As one historian noted, "to the children memorizing the UDC's catechisms, not only did the correct answers come from the truth-telling chapter leaders, but more importantly, they came straight from God."[33]

What the South lost on the battlefield, it sought to recover in the collective memory of the next generation. "We have pledged ourselves to see that the truth in history shall be taught," proclaimed UDC officer Kate Noland Garnett, and there "shall be no doubt in the minds of

---

& Feminism 31, 36-37 (1996) ("Men constituted the majority of the actual lynchers, . . . women and children took an active role in the murders by cheering on the lynchers, providing fuel for the execution pyre, and scavenging for souvenirs after the lynchings.").

[27] Wilson, *supra*, at 111.

[28] Gaines M. Foster, Ghosts of the Confederacy 161-62 (1987).

[29] *Id.* at 172. The UDC was founded in 1894 and is still in existence today with active chapters in over 30 states. *See* United Daughters of the Confederacy, http://www hqudc.org/history-of-the-united-daughters-of-the-confederacy/. There was also a reshaping of the national memory through film. "*The Birth of a Nation*, in the judgment of more than one historian of the period, was uniquely responsible for encoding the white South's version of Reconstruction on the DNA of several generations of Americans." David L. Lewis, W.E.B. DuBois: The Fight for Equality and the American Century, 1919-1963, 86-87 (2000). That film merited a private screening at the White House where all of President Woodrow Wilson's cabinet members and their families were encouraged to attend. O'Reilly, *supra*, at 90.

[30] Foster, *supra*, at 172.

[31] *Id.* at 108, 116, 172. Children of the Confederacy learned a narrow version of Southern history, often from textbooks authored or explicitly approved by UDC members. Amy Lynn Heyse, *The Rhetoric of Memory-Making: Lessons from the UDC's Catechisms for Children*, 38 Rhetoric Society Q., Fall 2008, at 408, 409.

[32] Heyse, *supra*, at 419.

[33] *Id.*

future generations as to the causes of the war, and why Southern men were forced to take up arms to defend their homes from the invading North."[34]

The UDC also defended the KKK. One set of catechisms ended with a lesson teaching children that the Klan "protected whites from negro rule."[35] At a speech at the 1913 UDC Convention, UDC Historian General Mildred Rutherford stated, "[t]he Ku Klux Klan was an absolute necessity in the South at this time. This Order was not composed of 'riff raff' as has been represented in history, but of the very flower of Southern manhood. The chivalry of the South demanded protection for the women and children of the South."[36]

How the War would be remembered continued to be a point of contention between Union and Confederate veterans. At an event in 1900, Union veteran Albert D. Shaw argued that "the keeping alive of sectional teachings as to the justice and rights of the cause of the South, in the hearts of the children, is all out of order, unwise, unjust, and utterly opposed to the bond by which the great chieftain Lee solemnly bound the cause of the South in his final surrender."[37] Confederate veteran John B. Gordon responded,

> In the name of the future of the manhood of the South I protest. What are we to teach them? If we cannot teach them that their fathers were right, it follows that these Southern children must be taught that they were wrong. Are we ready for that? For one I am not ready! I never will be ready to have my children taught I was wrong, or that the cause of my people was unjust and unholy.[38]

Even into the 20th century, Southerners continued to defend secession and their supposed God-ordained supremacy. In 1904, Mississippi Congressman and later United States Senator

---

[34] Garnett was the Chair of the History Committee of UDC's Virginia Chapter in 1907. Fred Arthur Bailey, *"Play the Bitter Loser's Game": Free Speech and the Lost Cause in Old Dominion*, 103 Va. Mag. of Hist. & Biography, Apr. 1995, at 237, 237.
[35] Heyse, *supra*, at 428.
[36] Mildred Lewis Rutherford, Four Addresses 39 (1916). Rutherford was the Historian General of the UDC from 1911 to 1916.
[37] Steven E. Sodergren, *"The Great Weight of Responsibility": The Struggle Over History and Memory in Confederate Veteran Magazine*, Southern Cultures, Fall 2013, at 26, 27.
[38] *Id.*

John Sharp Williams offered the following reason for the war: "This other thing for which we fought was the supremacy of the white man's civilization in the country which he proudly claimed as his own; 'in the land which the Lord his God had given him;' founded upon the white man's code of ethics, in sympathy with the white man's traditions and ideals."[39]

Another piece of the South's revisionist campaign was the movement to construct Confederate monuments throughout the country.[40] The construction of these memorials happened in waves connected to the racial climate of the South.[41] The first wave occurred at the turn of the 20th century and coincided with the rise of Jim Crow.[42] The next significant wave occurred in conjunction with the modern Civil Rights Movement.[43] Between schools, public buildings, state holidays, monuments, and roads, Mississippi's landscape became inundated with memorials to the Confederacy.[44]

In the 1940s, the Confederate battle flag became the emblem of the States' Rights Democratic Party, often referred to as the Dixiecrats.[45] What the Dixiecrat Party lacked in electoral votes, it made up for by energizing the next generation of segregationists.[46] Student delegates entered the 1948 Democratic National Convention carrying images of the

---

[39] *Confederate Veteran* was the publication of the United Confederate Veterans (UCV). John Sharp Williams, *Issues of the War Discussed*, 12 Confederate Veteran, Nov. 1904, at 517, 517. The UCV, composed of thousands of Confederate veterans from all classes, was viewed as the companion organization to the UDC. It also held meetings and reunions, which were premiere social events in which women and children attended and participated. The 1894 reunion in Birmingham, for example, drew more than 20,000 attendees to its Confederate battle emblem-adorned festivities. Gaines, *supra*, at 133.

[40] John J. Winberry, *"Lest we Forget" The Confederate Monument and the Southern Townscape*, 55 Southeastern Geographer, Spring 2015, at 19, 20.

[41] *Id.* at 23.

[42] Southern Poverty Law Center, *Whose Heritage? Public Symbols of the Confederacy*, at 9 (2016).

[43] *Id.*

[44] *Id.* at 24-26.

[45] "The Dixiecrats were a reactionary protest organization comprised of economically conservative, segregationist southern Democrats who sought to reclaim their former prestige and ideological prominence in a party that had moved away from them." Kari Frederickson, The Dixiecrat Revolt and the End of the Solid South 5 (2001).

[46] Students from Birmingham Southern marched onto the Convention floor behind a larger-than-life photo of General Lee. University of Mississippi students entered the arena waving the Confederate battle flag. Staff Post Writers, *Around the Hall—Wallace Pickets Greet Delegates*, Birmingham Post, July 17, 1948.

Confederacy.[47] Dixiecrat opposition to the budding Civil Rights Movement breathed new life into the Confederate battle emblem.[48]

Inspired by the Dixiecrats, after the Convention, University of Mississippi students adopted the Confederate battle emblem as a prominent symbol, synonymous with their school spirit. It remained on campus for decades.[49]

In this era, States also hoisted the Confederate battle emblem in symbolic defiance of changing laws that threatened Jim Crow. In 1956, Georgia redesigned its flag to include the Confederate battle emblem, and in 1962, South Carolina placed the Confederate battle emblem atop its State Capitol.[50] Alabama followed suit in 1963, when Governor George Wallace raised the emblem at the state capitol as a visual reminder of his "Segregation Forever" campaign.[51]

The centennial of the Civil War gave Southern states yet another reason to commemorate the Confederacy. By early 1960, every Southern state had a commission to coordinate local centennial events.[52] Mississippi's commission included state agencies and civic organizations,

---

[47] Frederickson, *supra*, at 136.

[48] *Id.* at 136-37.

[49] *See* James Forman, Jr., *Driving Dixie Down: Removing the Confederate Flag from Southern State Capitols*, 101 Yale L.J. 505, 505 n.6 (1991). Actually referring to it as a *prominent* image is an understatement. It was the *predominant* symbol. Among other things, the university "distributed small Confederate flags before each football game as fans entered into the stadium and cheerleaders carried large flags down on the field." Ronald J. Rychlak, *Civil Rights, Confederate Flags, and Political Correctness: Free Speech and Race Relations on Campus*, 66 Tul. L. Rev. 1411, 1416 (1992). The scene is described in the 1981 University of Mississippi yearbook in this way: "amidst a sea of Rebel flags waving to strains of *Dixie*, these Confederate Soldiers fight for the Gallant Cause." *Id.*

[50] Forman, *supra*, at 505. The South Carolina Legislature had first hung the flag in the House Chambers and then in the Senate Chambers. We do not have to guess at the meaning it ascribed to the flag. During a 1960 speech celebrating South Carolina's secession centennial, the legislator instrumental in raising the flag stood before the State Senate and heaped praise upon the Ku Klux Klan. "We honor them and we are proud of them," he declared. He went on to challenge the members to "dismiss from your consideration any little-sister sob stories about the South's brutality to the slave and its inhuman treatment of captive and fugitive slaves." L. Darnell Weeden, *How to Establish Flying the Confederate Flag with the State as Sponsor Violates the Equal Protection Clause*, 34 Akron L. Rev. 521, 531 (2001).

[51] Forman, *supra*, at 505.

[52] Robert Cook, *(Un)Furl That Banner: The Response of White Southerners to the Civil War Centennial of 1961-1965*, 68 J. of Southern Hist., Nov. 2002, at 879, 885.

and it received $200,000 in state appropriations to support its efforts.[53] Governor Ross Barnett noted during a speech to the delegates of the Confederate States Civil War Centennial Conference that everyone was welcome to come to Mississippi to celebrate the centennial— except the freedom riders.[54] In Jackson, Governor Barnett led a Secession Day parade as he rode in a horse-drawn carriage. Hundreds of white Mississippians dressed in Confederate uniforms marched behind a large Confederate battle flag borrowed from the University of Mississippi.[55]

The Confederate battle emblem's meaning has not changed much in the intervening decades. It should go without saying that the emblem has been used time and time again in the Deep South, especially in Mississippi, to express opposition to racial equality. Persons who have engaged in racial oppression have draped themselves in that banner while carrying out their mission to intimidate or do harm.

### C.  The Mississippi State Flag

#### 1.  1890 Constitutional Convention and Adoption of the State Flag

Now, let us turn to Mississippi's banner. In 1890, Mississippians held a Constitutional Convention. Its purpose was clear. "Our chief duty when we meet in Convention, is to devise such measures, consistent with the Constitution of the United States, as will enable us to maintain a home government, under the control of the white people of the State," said State Senator Zachariah George.[56] In other words, the Convention was not intended to ensure the proper implementation of the post-Civil War Constitutional Amendments, but rather to permit

---

[53] *Id.* $200,000 in 1960 is equivalent to $1,625,993.24 today. *See* http://www.usinflationcalculator.com/ (last viewed on Aug. 28, 2016).

[54] Cook, *supra*, at 899.

[55] *Id.* at 893. One writer described this battle flag as the "world's largest, . . . stretch[ing] from one side of Capitol Street to the other." Robert S. McElvaine, *Mississippi Grays*, N.Y. Times, Apr. 13, 2011.

[56] James P. Coleman, *The Mississippi Constitution of 1890 and the Final Decade of the Nineteenth Century*, in A History of Mississippi 8 (Richard Aubrey McLemore, ed., University and College Press of Mississippi) (1973).

"white people" to take back their state from the multi-racial coalition which had governed Mississippi after the War.[57]

During the Convention, delegates adopted voting laws that imposed landownership, poll tax, and literacy requirements, and excluded persons with certain criminal convictions.[58] These voting restrictions guaranteed the exclusion of African-Americans from the electoral process; Nicholas Lemann concluded that there was only *one* "Mississippi election in the century following emancipation in which there was truly free Negro voting."[59] It was not until the passage, implementation, and enforcement of the Voting Rights Act of 1965, a law which has been described as "the greatest civil rights legislation since Reconstruction," that some semblance of order was restored.[60]

Against this backdrop of legalized segregation, the current Mississippi state flag was adopted in 1894.[61] Senator E.N. Scudder is credited with its design. He "loved the memory of the valor and courage of those brave men who wore the grey," his daughter later remembered.[62] "He told me that it was a simple matter for him to design the flag because he wanted to perpetuate in a legal and lasting way that dear battle flag under which so many of our people had so gloriously fought."[63]

The flag adopted during that special session has remained, either officially or unofficially, the state banner.

---

[57] *See* Lemann, *supra*, at 81 (describing the violence of the 1870s as "terrorism in service of a coherent cause, the overthrow of Reconstruction").

[58] Coleman, *supra*, at 14.

[59] Lemann, *supra*, at 101. As one editor of a Mississippi newspaper put it, "[t]he negroes are as far from participating in governmental affairs in this state as though they were [in] a colony in Africa." Gordon A. Martin, Jr., Count Them One by One: Black Mississippians Fighting for the Right to Vote 8 (2010) (citation omitted).

[60] Martin, *supra*, at ix.

[61] *Mississippi Div. of United Sons of Confederate Veterans v. Mississippi State Conference of NAACP Branches*, 774 So. 2d 388, 391 (Miss. 2000).

[62] David G. Sansing, *Flags Over Mississippi*, Mississippi History Now, Aug. 2000. Her quote is a telling example of her era's collective historical myopia.

[63] *Id.*

### 2.   Legal Challenges to the State Flag and the 2001 Referendum

This is not the first time parties have sought to litigate the constitutionality of the Mississippi flag.[64] The most notable of those challenges is the 1993 case brought by the Mississippi State Conference of NAACP Branches; the Jackson, Mississippi NAACP Chapter; and 81 individual plaintiffs, *Mississippi Div. of United Sons of Confederate Veterans v. Mississippi State Conference of NAACP Branches*.[65] In that case, the Mississippi Supreme Court concluded that the 1894 statute creating the state flag had technically been repealed in 1906 when the legislature voted to repeal all statutes not brought forward as part of the Mississippi Code of 1906.[66] The Court, however, determined that it was the responsibility of the legislative and executive branches to keep or change the state flag.[67]

Following the Supreme Court's decision, Governor Ronnie Musgrove appointed a special commission to examine the issue, determine an alternate design, and make a recommendation to the legislature.[68] The commission convened public hearings and heard from citizens across the state.

Emotions ran high during the hearings. At the Meridian forum, those who opposed the state flag were called "scalawags who want to spit on the graves of my ancestors."[69] One person supported changing the flag by saying: "Some traditions are made to be kept. Some need to be

---

[64] *See Daniels v. Harrison Cnty. Bd. of Supervisors*, 722 So. 2d 136 (Miss. 1998) (challenging the flying of the Confederate battle flag on beaches and public property within the county); *see also United Sons of Confederate Veterans*, 774 So. 2d at 389 (seeking injunctive relief to enjoin future purchase, display, and maintenance of state flag on public property); *Briggs v. State of Mississippi*, 331 F.3d 499 (5th Cir. 2003) (alleging that the state flag which includes the St. Andrew's Cross violates the Establishment Clause).

[65] 774 So. 2d 388, 391 (Miss. 2000). The case was originally filed against then-Governor Kirk Fordice, and the court permitted the United Sons of Confederate Veterans to intervene. The plaintiffs' claims were dismissed, the NAACP appealed, and the case was remanded to determine whether sanctions were appropriate. In 1999, the Mississippi Supreme Court reinstated the case based solely on a claim under the Mississippi Constitution. *Id.* at 389.

[66] *Id.* at 391.

[67] *Id.* at 392.

[68] Jere Nash and Andy Taggart, Mississippi Politics: The Struggle for Power, 1976-2006, 280 (2006).

[69] *Id.*

thrown away."[70] Another citizen responded to a poll concerning voters' attitudes with this: "I don't think we should change something we hold sacred to make a point to (Northerners). I don't believe in turning to what the colored people want. We've got our rights too."[71]

In February 2001, the Mississippi legislature set a special election for April 17, 2001, where voters had the option of selecting the current flag or an alternate design as the state's official emblem.[72] The special election results substantially favored the 1894 flag, with 65% voting to keep it and 35% favoring the alternate design.[73] It once again was the State's official banner.

### 3. Charleston Shooting

Although the Confederate battle emblem has been debated for decades, it was the June 2015 mass murder of nine African-Americans during Wednesday night prayer and Bible study at Charleston's Emanuel AME Church that forced the country's most recent reevaluation. Shortly after the massacre, a photo emerged of the alleged shooter holding the Confederate battle emblem. The media also reported that the shooter had intended to start a "race war."[74]

The massacre had the opposite effect. Shocked and appalled, Americans came together with renewed appreciation for the racial divisiveness of the Confederate battle emblem. South Carolina and Alabama took action to remove the racially-charged symbol from their respective state houses.[75] Flag manufacturers announced they were going to discontinue the production of

---

[70] *Id.*

[71] *Id.* at 281.

[72] *See* Miss. Laws 2001, HB 524.

[73] Mississippi Official and Statistical Register, 2000-2004, 657-58 (2001); *see also* David Firestone, *Mississippi Votes by Wide Margin to Keep State Flag That Includes Confederate Emblem*, N.Y. Times, Apr. 18, 2001.

[74] Janell Ross, *Dylann Roof reportedly wanted a race war. How many Americans sympathize?*, Wash. Post, June 19, 2015.

[75] *See* Stephanie McCrummen and Elahe Izadi, *Confederate Flag Comes Down on South Carolina's Statehouse Grounds*, Wash. Post, July 10, 2015; Brian Lyman, *Bentley Orders Removal of Confederate Flags*, Montgomery Advertiser, June 24, 2015.

the emblem.[76] Several national retailers followed suit and announced they would stop selling Confederate battle emblem merchandise.[77] The vicious slaughter in Charleston had shifted the tide. Regardless of whether some viewed the flag as a way to honor their heritage and fallen ancestors, its connection to racial hatred and white supremacy could no longer be ignored.

Today, Mississippi stands alone. It is the *only* state to include the notorious "stars and bars" in its official flag.[78]

### 4. Mississippi's Response

While waiting on the State to act on the flag, Mississippi's cities, counties, and universities took action. They did not want to stand alone. Instead, they understood the divisiveness of the flag and voted to remove it from their property.[79]

Today, all but one of Mississippi's public universities—including traditionally white institutions like the University of Mississippi, the University of Southern Mississippi, and Mississippi State University—have removed the state flag from their campuses.[80] Considering

---

[76] Edward McAllister, *Major U.S. flag makers to stop making Confederate flags*, Reuters, June 24, 2015.

[77] *See* MJ Lee, *Walmart, Amazon, Sears, and eBay to Stop Selling Confederate Flag Merchandise*, CNN Politics, June 24, 2015; Susanna Kim and Rebecca Jarvis, *Amazon, Etsy to Ban Confederate Flag Merchandise, Joining Walmart, eBay*, ABC News, June 23, 2015.

[78] Because it includes the Confederate emblem, the Mississippi flag has been removed from display in other parts of the country. *See* Deborah Barfield Berry, *Confederate emblem removed at U.S. Capitol*, USA Today, Apr. 21, 2016; Bracey Harris, *Mississippi flag removed from Avenue of the States at DNC*, The Clarion-Ledger, July 26, 2016; Gordon Friedman, *Mississippi flag removed from Oregon Capitol*, Statesman Journal, Mar. 11, 2016.

[79] Associated Press, *Mississippi county will stop flying state flag*, AL.com, Jan. 6, 2016; Associated Press, *Mississippi Flag Banned in Leflore County*, WKRG.com, Aug. 15, 2015; Vershal Hogan, *State Flags taken down at Adams County buildings*, Apr. 5, 2016; Emanuella Grinberg, *Battle over Confederate symbols continues with Mississippi state flag*, CNN, June 19, 2016; *Oxford, Greenwood Removing Miss. Flag from City Property*, Jackson Free Press, Aug. 20, 2015; Donesha Aldridge, *Yazoo City Officials Removing Mississippi State Flag From City Buildings*, WJTV, Sept. 2, 2015 (incidentally, Yazoo County is the home of Senator John Sharp Williams, and he maintained his law practice in Yazoo City); Campbell Robertson, *Mississippi Flag, a Rebel Holdout, Is in a New Fight*, N.Y. Times, Nov. 7, 2015.

[80] Grinberg, *supra*; Vanessa Gillon, *State Flag Quietly Removed from Campus*, The Reflector, Aug. 29, 2016 (describing how Mississippi State University has also removed the flag from campus, but has been less public about its removal).

the University of Mississippi's long history with the Confederate battle emblem, it is noteworthy that students and faculty recognized its impact and voted to remove it.[81]

In Tupelo, racial tension has continued to swell following the shooting of an unarmed African-American man by a police officer.[82] During a recent public rally, the city lowered the flag because officials believed it aggravated racial discord.[83] On a separate occasion, Mayor Jason Shelton removed it from the city council chambers during a meeting. "You know there is no question that the state flag is offensive to a very large segment of the population," he commented.[84] "The people in the room today were universally opposed to the current state flag. I thought it was a gesture of respect to the people in the room today."[85]

Religious entities in Mississippi have also revisited the issue. The Episcopal Diocese of Mississippi urged state leaders to adopt a flag that "represents, unites, and respects" all Mississippians.[86] The Mississippi United Methodist Convention approved a resolution urging state leaders to change the state flag.[87] At the national level, the Southern Baptist Convention passed a resolution calling "brothers and sisters in Christ to discontinue the display of the Confederate battle flag as a sign of solidarity of the whole Body of Christ, including our African-American brothers and sisters."[88] To place the importance of its decision in context: the Southern

---

[81] Eliott C. McLaughlin, *Ole Miss Removes State Flag from Campus*, CNN, Oct. 26, 2015.
[82] Anna Wolfe, *Shooting in Tupelo: A Mississippi City Tries to Heal*, The Clarion-Ledger, July 20, 2016.
[83] *Id.*
[84] Katelyn Patterson, *State Flag Removed from Tupelo Council Chambers*, WTVA, Aug. 11, 2016.
[85] *Id.*
[86] Bob Burks, *Mississippi Episcopal Diocese Supports Changing State Flag*, Mississippi News Now, Feb. 19, 2016.
[87] Sarah Fowler, *Southern Baptist Convention Opposed Confederate Battle Flag*, The Clarion-Ledger, June 16, 2016.
[88] *Id.* During a recent hearing on another case, the Court heard testimony that Southern Baptists are the largest Christian denomination in Mississippi. *See Tr. of Mot. Hr'g.*, at 16, June 24, 2016, Cause No. 3:16-cv-417.

16

Baptists formed in 1845 because of disagreements with the larger Baptist denomination regarding slavery.[89]

When the national discussion about the Confederate battle emblem came to Mississippi in 2015, Mississippi's highest political leaders also weighed in. Governor Bryant stated, "[a] vast majority of Mississippians voted to keep the state's flag, and I don't believe the Mississippi Legislature will act to supersede the will of the people on this issue."[90] Philip Gunn, Speaker of the Mississippi House of Representatives, however, came out in support of changing the flag. "We must always remember our past, but that does not mean we must let it define us," he wrote. "As a Christian, I believe our state's flag has become a point of offense that needs to be removed. We need to begin having conversations about changing Mississippi's flag."[91] As Gunn suggested that conversations were welcome, Lieutenant Governor Tate Reeves, who presides over the Mississippi Senate, was of the view that those discussions had occurred 14 years ago, and added that the flag issue should not be decided "by outsiders or media elites or politicians in a back room."[92]

January 2016 came. The Mississippi legislature convened with an opportunity to change the state flag. And to that end, at least 16 bills were introduced regarding the flag. The bills varied, yet generally fell into three categories: proposing a new state flag design;[93] creating a

---

[89] Glen Jeansonne, *Southern Baptists Attitudes Towards Slavery 1845-1861*, 55 Georgia Hist. Q., Winter 1971, at 510, 510.
[90] Associated Press, *Mississippi Governor: State Flag Not Likely to Change*, Jackson Free Press, June 23, 2015. The Governor declined to call a special session to change the flag. *See* Bobby Harrison, *Bryant Rejects Call for Special Session about State Flag*, Daily Journal, June 26, 2015.
[91] Nick Gass, *Mississippi House Speaker: Flag 'has Become a Point of Offense*,' Politico, June 23, 2015.
[92] Press Release, *Lt. Gov. Reeves: Fate of State Flag Will 'Be Decided by the People of Mississippi*,' Jackson Free Press, June 23, 2015.
[93] *See* Miss. Laws 2016, HB 1538; Miss. Laws 2016, HB 1540; Miss. Laws 2016, HB 1547; Miss. Laws 2016, HB 1548; Miss. Laws 2016, HB 1551; Miss. Laws 2016, HB 1553; Miss. Laws 2016, SB 2148.

commission to recommend a new flag design or proposing a referendum;[94] or requiring public universities and municipalities to display the flag or suffer financial penalties.[95] Despite their differences, they suffered the same fate—they all died in committee, unable to clear even the first hurdle of the legislative process.[96] Thus, when sine die came, the stars and bars continued to wave.

It was in February 2016, the month designated as Black History Month, that Governor Bryant declared that April would be celebrated as Confederate Heritage Month.[97] This combination of legislative inaction and executive decree motivated Moore to file this suit.[98]

After the session, Speaker Gunn expressed his disappointment that action was not taken on the state flag.[99] At this summer's Neshoba County Fair, "Mississippi's Giant House Party,"[100] Governor Bryant concurred. "I think this November would have been a great opportunity (for people to vote on the state flag); we would have had more people turning out than almost any

---

[94] *See* Miss. Laws 2016, HB 1539; Miss. Laws 2016, HB 1544; Miss. Laws 2016, HB 1545; Miss. Laws 2016, HB 1552; Miss. Laws 2016, SB 2147.

[95] For instance, one bill would have required state, county, and municipal offices, as well as public colleges and universities, to display the flag or else suffer a $2,500 per day penalty. *See* Miss. Laws 2016, HB 1546; *see also* Miss. Laws 2016, HB 1542; Miss. Laws 2016, HB 1543; Miss. Laws 2016, HB 1549; Miss. Laws 2016, HB 1550; and Miss. Laws 2016, SB 2487. Presumably some of these bills were introduced in response to state universities, cities, and counties taking unilateral action to remove the state flag. *See* Singer & Singer, Statutes and Statutory Construction § 49:3 (7th ed. 2014) ("courts generally turn to a law's pre-enactment history to discover its purpose, or object, or mischief at which it was aimed, when the statute's language is inadequate to reveal legislative intent.").

[96] Arielle Dreher, *All Flag Bills Die; House Speaker on State Flag: 'I have not Wavered,'* Jackson Free Press, Feb. 23, 2016. Since Mississippi does not maintain legislative history, it is not known whether any of these bills were even openly discussed during committee meetings. The inaction is remarkable since Speaker Gunn was in perhaps the best position to lead a legislative conversation on this issue. It is also noteworthy that his motivation for changing the flag, his Christian faith, inspired him to author *and pass* a "religious liberties" bill in 2016 (HB 1523).

[97] Jacob Threadgill, *Mississippi Declares April Confederate Heritage Month*, The Clarion-Ledger, Feb. 25, 2016.

[98] At oral argument, Moore explained that he "filed this lawsuit in February shortly after the governor announced Confederate Heritage Month in the month of February . . . . He could have declared Confederate Heritage Month in the month of March. He could have done it on April the 1st. But to do it in February was the straw that broke the camel's back. I had enough." Tr. of Oral Arg. at 86-87.

[99] R.L. Nave and Adam Ganucheau, *Gunn, Reeves Tout Religious Freedom Bill, Tax Cuts*, Mississippi Today, Apr. 21, 2016.

[100] For decades, the Neshoba County Fair has been Mississippi's premiere political event; it is where state and national politicians have taken to the stage to sway voters. When Ronald Reagan wanted to win over the rural white vote, he became the first presidential candidate to speak at the Fair. Nash & Taggart, *supra*, at 119. Then in 1995, gubernatorial candidates Dick Molpus and Kirk Fordice faced off at the Neshoba County Fair in what came to be known as the "Great Debate." *Id.* at 252-53.

election," he said. "I'm sorry that we don't have it on the ballot, and the people's voices won't be heard."[101]

### III. Discussion

The Court, acting *sua sponte*, ordered the parties to brief two procedural issues—standing and the political question doctrine. Finding that standing is the controlling question, the Court will limit its analysis to this single issue.

Article III of the Constitution does not grant federal courts unfettered power to consider any issue. Instead, the authority of the federal courts extends only to cases and controversies.[102] "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[103]

To demonstrate a case or controversy, a plaintiff, "based on [his] complaint, must establish that [he has] standing to sue."[104] The Article III standing requirement, "which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."[105]

It is well-established that standing requires the plaintiff to demonstrate three elements: (1) an injury in fact that is concrete and particularized as well as actual or imminent; (2) a causal connection between the injury and the conduct of the defendant; and (3) a likelihood that the injury will be redressed by a favorable judicial decision.[106] "The fundamental aspect of standing

---

[101] Arielle Dreher, *Bryant on State Flag: 'I'm Sorry We Don't Have it on the Ballot,'* Jackson Free Press, Aug. 1, 2016. The Governor's disappointment is striking, especially since he possesses the sole authority to remedy the fact that the "people's voices won't be heard." He could have called a special session during the regular session to revive the bills that died in committee, or even called the legislators back to Jackson after the session ended, as he had to do in June 2016 to address a budget issue. *See* Miss Const. art. 5, § 121.

[102] *See* U.S. Const. art. III, § 2.

[103] *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation and quotation marks omitted).

[104] *Id.* (citation omitted).

[105] *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (citations omitted).

[106] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated."[107]

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.[108]

In other words, courts may dismiss due to lack of subject matter jurisdiction on any of the following bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[109]

Because standing is a jurisdictional issue, the Court may act on its own motion and it must dismiss where subject matter jurisdiction is lacking.[110]

### A.  Injury in Fact

To demonstrate an injury, the plaintiff must suffer "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[111]

An injury is particularized if it "affect[s] the plaintiff in a personal and individual way."[112] To meet the concreteness requirement, an injury must be "real, and not abstract."[113]

---

[107] *Flast v. Cohen*, 392 U.S. 83, 99 (1968).
[108] *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (citation omitted).
[109] *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).
[110] *See* Fed. R. Civ. P. 12(h)(3). The parties submitted multiple filings in response to the Court's order, and the Court will consider all pleadings in the record.
[111] *Lujan*, 504 U.S. at 560 (citation and quotation marks omitted).
[112] *Id.* at 560 n.1.
[113] *Spokeo, Inc. v. Robins*, 136 S. Ct 1540, 1548 (2016) (citation and quotation marks omitted).

"Concreteness, therefore, is quite different from particularization."[114] Intangible injuries can meet the concreteness requirement.[115]

To demonstrate an actual or imminent injury, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct."[116] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[117]

In his third amended complaint, Moore contends that the state flag violates his Fourteenth Amendment rights because it (1) makes him fear for his safety; (2) denies him equal treatment and dignity under the law; and (3) causes high blood pressure, anxiety, sleep disturbances, and abnormal EKGs.[118] "I'm entitled to be treated as a first-class citizen. I'm nobody's second class citizen, and I do not appreciate being treated as such," he said.[119] When the Court inquired as to how the state flag makes him feel like he is not equal to others, Moore responded,

> Because the State is saying, *We endorse the system, the oppressive regime that brutalized, enslaved your ancestors, not only by lynching them, raping them, murdering them, forcing them to inservitile [sic] labor. I support that. That was something I'm proud of. This is Confederate Heritage Month. We still relish the good ol' days in Mississippi and it's almost a constant threat and reminder that we could take you back to those days.*[120]

---

[114] *Id.*

[115] *Id.* at 1549.

[116] *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations and quotation marks omitted).

[117] *Lujan*, 504 U.S. at 565 n.2 (citation and quotation marks omitted).

[118] Moore also alleges that the Confederate emblem violates the Thirteenth Amendment because it constitutes a "badge and indicia of slavery." Docket No. 7, ¶ 11. Congress alone has the right to pass legislation regarding the Thirteenth Amendment. *See United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 120 (5th Cir. 1973); *Wong v. Stripling*, 881 F.2d 200, 203 (5th Cir. 1989) (concluding that Congress is empowered "to define and abolish the badges and the incidents of slavery"). Moore fails to properly argue how any Congressional action gives him standing to challenge the Confederate emblem.

[119] Tr. of Oral Arg. at 69.

[120] *Id.*

### 1.  Fear for his Safety

In light of the June 2015 mass shooting in Charleston, the November 2015 Wal-Mart bombing in Tupelo, and the 2014 noose brandishing at the University of Mississippi, Moore alleges he fears for his safety.[121]

Without question, each of these incidents was an atrocious act of violence or intimidation with clear racial overtones. In the University of Mississippi case, the students ultimately pled guilty to charges reflecting the racial motivation of their conduct, and they have been punished.[122] Similarly, the alleged Charleston shooter is currently facing charges on multiple criminal counts, including federal hate crime charges.[123] If he is convicted, he may be executed.[124]

These incidents, however, cannot show that Moore is particularly at risk of harm as a result of the Confederate battle emblem.[125] An act of racial or ethnic violence does not establish a constitutionally-recognized injury for anyone who falls into the racial or ethnic group. He does not allege he was in the vicinity when any of these events occurred; he likely heard about them from news coverage as did thousands of other citizens. Because there is nothing showing that fear of racial violence is particular to him, Moore lacks standing to make this claim.[126]

---

[121] To be clear, these events involved only the Confederate battle emblem, not the full Mississippi flag.

[122] *See* Plea Agreement of Austin Edenfield, Docket No. 11, *United States v. Edenfield*, No. 3:15-cr-108-MPM-SAA (N.D. Miss. Mar. 24, 2016); Plea Agreement of Graeme Phillip Harris, Docket No. 20, *United States v. Harris*, 3:15-cr-22-MPM-SAA (N.D. Miss. June 18, 2015).

[123] Michael Martinez, *Dylann Roof Pleads Not Guilty to Federal Charges in Charleston Church Attack*, CNN, July 31, 2015.

[124] Mark Berman and Matt Zapotosky, *Justice Department will seek death penalty for accused Charleston church gunman Dylann Roof*, Wash. Post, May 24, 2016. For his state charges, Roof also faces death. *Id.*

[125] At the hearing, Moore attempted to raise arguments related to threats on his life that occurred *after* the filing of this suit. Tr. of Oral Arg. at 115. Although he contended that some of those threats occurred between the filing of his initial complaint and the third amended complaint, he did not include them in his third amended complaint; therefore, those allegations are not properly before this Court and will not be considered. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289, 291 (5th Cir. 2006).

[126] *See Spokeo*, 136 S. Ct. at 1548.

Moore also does not show that any injury is imminent. He says that "[t]ime is of the essence for the removal of the current state flag" because of the Charleston shooting, but does not demonstrate how that incident increased the imminent threat of a similar attack.[127]

To find an injury based on this plaintiff's fear for his safety would stretch the elasticity of imminence well beyond its purpose. Sadly, any person can be a victim of violence. And, while there are countless examples of violence against minority groups, including African-Americans, Moore's fear that the State flag and its continued display will lead to imminent violence against him falls short of Constitutional standing.

### 2.   Denial of Equal Treatment

Next, the Court considers Moore's allegations that he has been deprived of equal dignity and equal treatment in violation of the Fourteenth Amendment of the United States Constitution.

Courts have recognized stigmatic injuries, which are often intangible, as sufficient to meet the Article III injury requirement.[128] "Stigmatic injury stemming from the discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies some concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine."[129] This Court, for example, has previously found that same-sex marriage bans stigmatized same-sex couples by denying them an equal opportunity to receive a State-issued marriage license and the rights and benefits associated with that license.[130]

---

[127] Docket No. 7, ¶ 15.
[128] *See Campaign for Southern Equality v. Bryant*, 64 F. Supp. 3d 906, 917 (S.D. Miss. 2014).
[129] *Id.*
[130] *Id.*

23

Moore points to the Sixth Circuit's decision in *Smith v. City of Cleveland Heights* to support his argument that he has suffered a stigmatic injury.[131] In that case, Cleveland Heights passed policies to maintain the city's racial composition of 75% white and 25% African-American residents.[132] Potential white residents were steered toward Cleveland Heights and potential African-American residents were steered elsewhere.[133] The plaintiff in that case, who already lived in the city, filed suit alleging that the city's policies "stigmatize[d] him as an inferior member of the community" and limited his ability to "associate freely" with other African-Americans who may move into the city.[134] The Sixth Circuit found standing and concluded that the policy directly impacted plaintiff's "interest in his own self-respect, dignity, and individuality."[135]

Moore contends the Mississippi flag has the same effect on him, but the cases are not analogous. In *Smith,* the plaintiff's stigmatic injury was directly related to a city policy that expressly denied equal treatment to him on the basis of race.[136] In other words, it was "a stigmatic injury suffered as a direct result of having personally been denied equal treatment."[137]

In contrast, Moore has failed to allege any specific facts or incident where he was denied equal treatment due to the state flag or the message it communicates. Because the third amended complaint lacks such allegations, at oral argument, the Court asked him how he has been denied equal treatment. Moore was unable to provide an example of a deprivation of a legal right.

---

[131] 760 F.2d 720 (6th Cir. 1985).
[132] *Id.* at 721.
[133] *Id.*
[134] *Id.* at 722.
[135] *Id.*
[136] *Id.* at 723.
[137] *Allen v. Wright*, 468 U.S. 737, 755 (1984).

Moore also claims a right to "equal dignity" based on the Supreme Court's recent same-sex marriage decision, *Obergefell v. Hodges*.[138] "Prior to *Obergefell*," he said at oral argument, "I had no knowledge that I had a right to equal dignity under the law."[139] Moore also references *Loving v. Virginia* and *Brown v. Board of Education* as examples of when the federal courts had to intervene to protect individuals' Constitutional rights and dignity.

The Court is well-aware of those cases, but Moore's argument attempts to contort their holdings beyond recognition. All of those cases involved a legal right guaranteed by the Fourteenth Amendment—specifically, the right to marry and the right to receive a public education free from racial discrimination. Those plaintiffs' rights had been infringed upon because they were actually treated differently than others. Moore alleges no analogous legal right; he feels like "a second-class citizen simply because of the fact [he is] African-American."[140] Without sufficient facts that Moore is *treated* differently because of the state flag, his argument that he *feels* like a second-class citizen does not give rise to a legal injury. Where there is no legal right being violated, an injury is not real—and thus cannot be deemed concrete.

### 3. Physical Injuries

Moore says he feels "great concern and anxiety when I enter public property adorned with the state flag," which "has probably contributed to or caused the exacerbation of medical ailments, including but not limited to hypertension, insomnia and abnormal EKGs."[141] He adds that "since what happened in South Carolina and since what happened in Walmart in Tupelo in November, I have experienced abnormal EKGs."[142]

---

[138] 135 S. Ct. 2584 (2015)
[139] Tr. of Oral Arg. at 66.
[140] *Id.* at 64.
[141] Docket No. 7, ¶¶ 11-12.
[142] Tr. of Oral Arg. at 115.

Plaintiff's counsel specifically argued that Moore experiences stress when he enters courtrooms that display the state flag.[143] But in addition to engaging in the private practice of law for a living, Moore also accepted an appointment to be the city prosecutor in Webb, Mississippi. This position requires regular courtroom appearances. Moore argued that declining the position would economically impact his family. "[O]nly with a state appointment can I get state benefits," he asserted. "I could not get on PERS. That would be a detriment to me. I needed to start PERS as soon as I could."[144]

To the extent Moore experiences stress because of the state flag, he appears willing to experience it for economic gain. When the Court asked about limiting his practice to federal court, where he would not necessarily encounter the state flag, he said that his wife "has got accustomed after 15 years of marriage to a certain quality of life. And it's not fair to her" to accept "a lower standard of living because I only had certain cases in federal court."[145]

Moore's arguments are phrased as constitutional claims, yet his allegations of physical injuries suggest that he is making an emotional distress tort claim. To succeed in constitutional litigation, however, Moore needs to identify that part of the Constitution which guarantees a legal right to be free from anxiety at State displays of historical racism.[146] There is none. We are again back at a stigmatic injury untethered to a legal right, and that—even a stigmatic injury causing physical ailments—is not sufficient for standing.

---

[143] *Id.* at 22.

[144] *Id.* at 81. Moore is adamant that the State makes him feel like a second-class citizen, yet he gladly accepted a voluntary state appointment in order to collect state benefits.

[145] *Id.* at 92.

[146] Within our state, there are countless "displays" of historical racism stemming from slavery, the Confederacy, and the killing of Native Americans. Counties, municipalities, streets, and a reservoir are named in honor of those who lived and died for the cause of the Confederacy and its hateful legacy. Numerous counties have public spaces, including courthouse squares that should be associated with justice, adorned with statues commemorating the Confederacy and white supremacy. Every day, Mississippians work and transact business in public buildings named for individuals who could not fathom in their lifetime that *all* Mississippians would have the legal and moral right to enter such a building. One can only wonder what figures such as Robert E. Lee, Andrew Jackson, Nathan Bedford Forrest, Hernando de Soto, Carroll Gartin, and Walter Sillers would have to say about the diversity of citizens living and working in the counties and buildings named in their honor.

### B.  Injury Traceable to Conduct

Even assuming that there is a cognizable injury in this case, that injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[147]

The current state flag has been flying in Mississippi for Moore's entire lifetime. He did not file the instant case until February 2016, when he was 39 years old. The catalyst for this suit was evidently his fear resulting from recent instances of racial violence and intimidation in South Carolina and Mississippi, and the lack of action by Mississippi's leaders. Moore's fear and the necessity of this suit were apparently compounded by the Governor's proclamation of April as Confederate Heritage Month during Black History Month.[148]

Although the Confederate battle emblem has some varying connection to those incidents, Moore has not traced his fear stemming from those events to the State's conduct. The Confederate battle emblem has been used by white supremacists, but Moore fails to show how the flag is responsible for his fears, as opposed to individuals who are not before this Court. His fear is not any more traceable to the acts of terror in South Carolina and Mississippi than it is to any of the many other racially-motivated crimes that have occurred in Mississippi and across the country during Moore's life. And Moore's stigmatic injury is not any more traceable to the flag than it is to the racist beliefs he feels elected leaders and other Mississippians harbor.

During oral argument, the Court inquired into the start date of Moore's physical injuries to determine how they are traceable to the state flag. Plaintiff's counsel stated that they were ongoing injuries that did not begin on a specific date.[149] She said Moore was injured by his birth in Mississippi, the 2001 flag referendum, local entities declining to remove the flag, and the

---

[147] *Lujan*, 504 U.S. at 560 (citation, quotation marks, brackets, and ellipses omitted).
[148] Tr. of Oral Arg. at 87.
[149] *Id.* at 7.

failed legislative bills in the 2016 session.[150] Later, Moore himself argued that his physical injuries and associated stress began and have continued to mount since 2002, when he was sworn into the Mississippi Bar.[151] He added, "[b]ut this specifically what happened in the month of February before I filed the lawsuit. There was the legislature refusing to act and then the Governor declaring Confederate Heritage Month. I went to the doctor around that time and I had these abnormalities."[152]

A problem with Moore's argument is that any number of factors can contribute to these types of chronic health conditions: genetics, stress, the practice of law, diet, and lack of exercise, to name a few. Even the stress and anxiety he experiences when entering a courthouse (or awaiting a Court's ruling) could easily be attributable to concern about a pending proceeding. Moore offers no plausible allegation that these physical injuries are directly attributable or even exacerbated by the state flag, when there are so many other competing explanations of their cause. Thus, it is impossible for the Court to see how Moore could establish those injuries as fairly traceable to a flag that has been in existence for his entire life.

Lastly, Moore is again unlike the gay couples in the same-sex marriage cases. In those cases, the plaintiffs' injuries were traceable to state statutes and constitutional amendments which explicitly forbade governmental officials from issuing marriage licenses to gay couples, effectively giving government officials a license to discriminate. There is no comparable legal injury here, much less an injury traceable to the state flag.

---

[150] *See id.* at 27.
[151] *Id.* at 96, 117.
[152] *Id.* at 117.

### C.  Redressability by Favorable Judicial Decision

The final prong of standing requires the plaintiff to demonstrate that a favorable judicial decision is likely to redress his injury.[153] The determination of redressability turns on the specific facts plaintiff presents.

Here, Moore contends,

[a] favorable decision would eliminate the discriminatory laws, eliminate stigmatic injury, eliminate the imminent threats to Plaintiff, his health, and his family, as well as eliminate the potential of Plaintiff inadvertently violating his oaths due to his inability to support the discriminatory laws of the state that he is currently bound by oath and statute to support.[154]

At oral argument, when Moore was asked whether the removal of the flag would improve his insomnia, EKGs, and stress, he responded, "[i]mmediately."[155]

As the Court has discussed in detail, the injuries alleged by Moore are untethered to a legal right. In instances where this Court has found that a plaintiff's stigmatic injury could be redressed by a favorable judicial decision, the injury has been connected to a fundamental right. On the facts of this case, however, there is no legal right at issue which the Court can remedy.

For these reasons, Moore does not have standing to bring this action.

### IV.  Motion to Amend Complaint

Lastly, Moore filed a motion seeking leave to amend his third amended complaint. "The court should freely give leave when justice so requires."[156] Leave to amend is guided by the following factors: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure

---

[153] *Lujan*, 504 U.S. at 561.

[154] Docket No. 23, at 7.

[155] Tr. of Oral Arg. at 96. Considering the seriousness of this case, the Court finds that response not worthy of credence.

[156] Fed. R. Civ. P. 15(a)(2). Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), a plaintiff can amend his pleading once as a matter of course within 21 days of serving it. Here, the Governor was served on March 7, 2016. By that time, Moore had already amended his complaint three times. In its Order setting a briefing schedule, the Court required him to seek leave of Court to further amend his complaint. Docket No. 13, at 4.

deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment.[157]

Since the Court found no standing based on Moore's third amended complaint, the present analysis focuses on whether the proposed fourth amended complaint would confer standing. If it would not, allowing Moore to amend would be futile.

Moore's fourth amended complaint adds his minor child, A.M., as a plaintiff and the State Superintendent of Education and the Grenada Public School System as defendants.[158] Moore explains that his daughter is five years old and set to begin kindergarten in the Grenada Public School system in fall 2016.[159] He then identifies two state statutes that allegedly violate A.M.'s First Amendment rights: Mississippi Code § 37-13-5, which requires public schools to fly the state flag and teach its history, and Mississippi Code § 37-13-7, which requires public schools to teach students the pledge of allegiance to the Mississippi flag.[160] He argues that A.M. "will suffer imminent and irreparable harm should she be required to start public school in August 2016 with the aforementioned statutes still in place and in force."[161]

Section 37-13-5 indeed requires public schools to provide a course of study about the American and Mississippi flags, as well as their history. In this facial challenge, however, Moore's complaint lacks any allegations that would allow this Court to conclude that requiring teachers to provide instruction regarding the state flag and its history in any way encroaches upon A.M.'s constitutional rights. The very purpose of our public education system is to provide instruction and in many instances present different viewpoints. The classroom is an appropriate

---

[157] *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).
[158] Docket No. 26-1, at 1.
[159] Moore filed this motion in March 2016, when his daughter was not required to attend public school. At the time, she attended an optional educational program at the school two days a week. Tr. of Oral Arg. at 114. Thus, at the time Moore filed his motion to amend his complaint, any claims involving his daughter were not ripe.
[160] Docket No. 26-1, ¶¶ 21-22.
[161] *Id.* ¶ 23.

place for academic discourse and critical thinking. On its face, a statute requiring children to be taught about the history of the Mississippi flag does not encroach upon a constitutional right.

The same is true for § 37-13-7. The statute does not require any student to recite the Mississippi pledge, and even if it did, Supreme Court precedent clearly prohibits students from being forced to say a pledge of allegiance.[162] Thus, Moore's facial challenge is unavailing. If future conduct gives rise to specific facts in which Moore's daughter is being forced to recite the pledge, then he could bring an action.

Because Moore's proposed fourth amended complaint does not cure the issue of standing, allowing him to amend would be futile. The motion is denied.[163]

## V. Conclusion

To millions of people, particularly African-Americans, the Confederate battle emblem is a symbol of the Old Mississippi—the Mississippi of slavery, lynchings, pain, and white supremacy. As Justice Fred Banks noted, the Confederate battle emblem "takes no back seat to the Nazi Swastika" in its ability to provoke a visceral reaction.[164]

The emblem offends more than just African-Americans. Mississippians of all creeds and colors regard it as "one of the most repulsive symbols of the past."[165] It is difficult to imagine

---

[162] *See West Virginia Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943). Section 37-13-7 requires teachers to have their students repeat the United States pledge of allegiance at least once a month. But § 37-13-6, which was enacted in 2002 and addresses only the United States pledge, states that "[a]ny student or teacher who objects to reciting the oath of allegiance shall be excused from participating without penalty." Therefore, it does appear there is analogous state law (in addition to federal precedent) that prohibits students from being forced to state a pledge of allegiance.

[163] *See Blackwell*, 440 F.3d at 291 ("Plaintiffs had three attempts to produce a sufficient complaint. The court dismissed the complaint and denied leave to amend only after the third insufficient attempt.").

[164] *Daniels*, 722 So. 2d at 140.

[165] Rychlak, *supra*, at 1421 (citation omitted); *see N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1562 (11th Cir. 1990) ("Citizens of all races are offended by its position.").

how a symbol borne of the South's intention to maintain slavery can unite Mississippians in the 21st century.[166]

Since the Civil War, this nation has evolved and breathed new life into "We the People" and "all men are created equal."[167] Mississippi is known for its resistance to that evolution. Part of that resistance stems from electing demagogues and those with empty rhetoric and false courage. The result is a State increasingly isolated from the rest of the nation.

At times there is something noble in standing alone. This is not one of those times. The Confederate battle emblem has no place in shaping a New Mississippi, and is better left retired to history.

For that change to happen through the judiciary, however, the Confederate battle emblem must have caused a cognizable legal injury. In this case no such injury has been articulated.[168] Whether that could be shown in a future case, or whether "the people themselves" will act to change the state flag, remains to be seen.[169]

This case is dismissed. A separate Final Judgment will issue.

**SO ORDERED,** this the 8th day of September, 2016.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[166] *See Hunt*, 891 F.2d at 1566 ("It is unfortunate that the State of Alabama chooses to utilize its property in a manner that offends a large proportion of its population."); *Coleman v. Miller*, 117 F.3d 527, 530 (11th Cir. 1997) ("[B]ecause the Confederate battle flag emblem offends many Georgians, it has, in our view, no place in the official state flag. We regret that the Georgia legislature has chosen, and continues to display, as an official state symbol a battle flag emblem that divides rather than unifies the citizens of Georgia.").

[167] *See* Marshall Bicentennial Speech, *supra*.

[168] "The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result." *Texas v. Johnson*, 491 U.S. 397, 420 (1989) (Kennedy, J., concurring) (holding that burning the American flag was expressive conduct entitled to First Amendment protection).

[169] "I know no safe depository of the ultimate powers of the society but the people themselves." Letter from Thomas Jefferson to William C. Jarvis (1820).